<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-4515**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JARED BARALOTO,

Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Benson Everett Legg, Senior District Judge. (1:10-cr-00134-BEL-3)

Argued: March 22, 2013                    Decided: July 25, 2013

Before KING, GREGORY, and KEENAN, Circuit Judges.

Affirmed by unpublished per curiam opinion. Judge Gregory wrote a dissenting opinion.

**ARGUED:** Steven Hale Levin, LEVIN & CURLETT LLC, Baltimore, Maryland; Michael Anthony Pusateri, Washington, D.C., for Appellant. Sujit Raman, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Jared Baraloto was convicted by a jury in the District of Maryland on the charges alleged in a superseding indictment stemming from his involvement in a widespread conspiracy to purchase and resell stolen goods. The indictment charged Baraloto with four offenses: (1) conspiring to transport stolen goods in interstate commerce, in violation of 18 U.S.C. § 371; (2) transporting stolen goods in interstate commerce, in contravention of 18 U.S.C. § 2314; (3) conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h); and (4) conspiring to commit wire fraud, in contravention of 18 U.S.C. § 1349. Baraloto appeals his convictions, maintaining that the court erred in allowing prosecution witnesses to speculate on whether goods were stolen, and asserting that the trial evidence was otherwise insufficient to support the verdict. As explained below, we affirm.

I.

The charges against Baraloto and his co-conspirators arose from a lengthy investigation into a large-scale organized retail theft scheme, in which shoplifters sold brand-new stolen items — mainly over-the-counter medications ("OTCs") and health-and-beauty aids ("HBAs") — to so-called "buy/sell" shops, including one called Fast Money, owned and operated by brothers Jerald

2

Bradford and Scott Bradford.[1]  In the conspiracy and theft scheme, Baraloto was a stolen property wholesaler, commonly known as a "fence," who purchased stolen goods primarily from the Bradfords and sold them to Jerome Stal.  In turn, Stal resold the stolen goods at flea markets, pawn shops, and retail websites, as well as to other wholesalers.

On March 25, 2010, investigators executed search warrants and arrested nearly all of the seventeen alleged conspirators, including Baraloto.  Agents recovered over $1,000,000 in stolen merchandise, approximately $1,000,000 from bank accounts, and more than $140,000 in cash from the targeted buy/sell shops and pawn shops.

### A.

On November 21, 2011, Baraloto alone proceeded to trial, during which the government presented the testimony of law enforcement officers and cooperating witnesses.[2]  The cooperating witnesses — most of them already convicted — confirmed the nature of the conspirators' business model, which consisted of

---

[1] As the government explains in its brief, a buy/sell shop allows customers to sell items outright, as opposed to a pawn shop, which permits its clientele to borrow money against items left with the shop as collateral.

[2] The trial lasted a total of nine days, ending on December 9, 2011.  There were twelve prosecution witnesses.  Baraloto did not testify.

purchasing new items in cash at steep discounts from shoplifters. One witness, Amber Boothe, testified that she, along with other shoplifters, had serious drug problems and used cash from the sale of stolen items to service their addictions. Boothe identified Baraloto as someone she saw at Fast Money when she was selling stolen goods.

The trial evidence further revealed that, in the final weeks before agents executed search warrants and ended the theft scheme on March 25, 2010, Baraloto and Stal partnered in a venture to purchase and operate a pawn shop called Blue Diamond. The pair intended that a major part of Blue Diamond's business would come from OTCs and HBAs, and they attempted to recruit shoplifters away from other buy/sell shops involved in the broader theft scheme. In early and mid-March 2010, investigators monitored Stal's personal cell phone, pursuant to a court-authorized wiretap. Those recorded calls revealed the details of the retail theft scheme, capturing numerous incriminating conversations among the various co-conspirators, including between Stal and Baraloto.

1.

At trial, the defense insisted that Baraloto was unaware that the trafficked goods might have been stolen, such knowledge being an essential element of the charged offenses. Baraloto's counsel explained during his opening statement that the "heavily

4

regulated" buy/sell industry had various safeguards in place to ensure its legitimacy. These safeguards included the requirement that shop owners "sheet," or document, each transaction and provide the record to the local police department's pawn unit. Each shop was also constrained to honor a "holding period" for every item it received, designed to "protect the victim of a crime [by] giving that person about 10 days to report the theft." J.A. 766-68.[3] According to his lawyer, Baraloto "believed that the pawn shops from which he purchased health and beauty aids were complying with the sheeting [requirements]," and, accordingly, he lacked the necessary knowledge to be convicted. Id. at 769-70. The defense emphasized that Baraloto operated transparently, was paid by check, and maintained detailed records of his transactions, all of which suggested he was a "legitimate businessman." Id. at 777.

Baraloto's lawyer explained that there was a thriving secondary market for damaged or expired OTCs and HBAs, comprised of "people who want to bargain or simply cannot afford to pay retail prices." J.A. 778. He suggested that the items Baraloto purchased from Fast Money were provided not by shoplifters, but

---

[3] Citations herein to "J.A. _____" refer to the contents of the Joint Appendix filed by the parties in this appeal.

5

instead by "dumpster div[ers]." Id. at 780. Those enterprising opportunists would retrieve new, in-the-box items from the dumpsters behind retail outlets and then sell the nearly expired or expired items for a profit to buy/sell shops. The shops would then resell such items to liquidators, flea markets, and individual buyers.

2.

Jerald Bradford, having pleaded guilty to criminal tax offenses, agreed to cooperate with the government. Bradford testified that, as part of his plea deal, he admitted that the items he purchased at Fast Money were stolen. Baraloto objected to this evidence, asserting that it was irrelevant, speculative, and made without firsthand knowledge. The district court overruled Baraloto's objection, however, reasoning that Bradford was merely offering his lay opinion based upon "common sense" and his "familiarity with the industry." J.A. 873.

Jerald Bradford explained that Fast Money was located in a depressed area of south Baltimore known as Brooklyn, which he characterized as "[v]ery rough, a lot of drugs, homicides." J.A. 878. Bradford testified that about 90% of his clientele was comprised of drug addicts, referring to the "IV, needle marks on their arms, skin pops, stuff like that, and from them telling me." Id. at 879. Bradford described the body odor attendant to many of his customers, who told him that they

6

"wouldn't take a bath to keep their pores close[d] so they would stay high." Id. The customers "all talked about how to score heroin. This is not something they keep hushed." Id. at 937. These were the people, Bradford said, who brought in "all new items, from health and beauty aid[s], you know, razors, Prilosec, general stuff, Tylenol, Advil, Aleve," that accounted for roughly 60% of Fast Money's $3.3 million in sales between 2005 and 2009. Id. at 879-80.

Jerald Bradford indicated that his "[c]ommon sense" told him the items were stolen: "[I]f someone came in with 20 boxes of Tylenol a hundred counts, 10 boxes of Prilosec, 42 counts [of] Fusion razor blades, going [to] sell them to me for less than a third of what they actually cost in the store," this was a clear indication the items were stolen. J.A. 885. Bradford stated that he only purchased items that Baraloto approved. Bradford explained that he met Baraloto in 2007, and the two began their business relationship after Baraloto offered to pay a higher percentage on Bradford's HBAs than Fast Money's existing wholesaler. Baraloto eventually visited Fast Money every day, where he witnessed customers walking in the door carrying bags of items, often interacting with them. According to Bradford, Baraloto would not purchase items that were damaged or expired. Bradford sold these items at flea markets.

7

Jerald Bradford's brother, Scott, explained how a typical HBA transaction at Fast Money worked: "[The customer] would come in and place the items that they were going to sell on the counter." J.A. 977. The customer typically sorted the items himself, while an employee filled out the transaction sheet, pursuant to the sheeting requirements. Scott Bradford testified that Fast Money paid their customers about one-third of the items' retail value.

As it had his brother, the government also asked Scott Bradford whether the HBAs he purchased were stolen. Baraloto objected on the ground that Bradford lacked the personal knowledge necessary to answer. The district court overruled the objection, observing that the government bore the burden of proving that the relevant items were stolen, and that circumstantial evidence — including that "the individuals who were doing the selling . . . [were] heroin addicts [and] that the products were in their original packaging" — was an appropriate means of meeting this burden. J.A. 991. The court added that the Bradford brothers could "testify as to their conclusion, their lay opinion that many of the goods were stolen" for a number of reasons, not least because "it explains the actions that they took." Id. at 992.

Scott Bradford thus explained that he knew the items he purchased were stolen because he "heard customers talk about the

8

stuff they brought in," including asking one another where they "shop," or whether particular individuals were "on vacation" (i.e., in jail). J.A. 993-94. Bradford noticed track marks and other indicia of drug addiction on Fast Money's customers, and he confirmed that Baraloto often "hung out" at Fast Money, interacted with the customers, and would have overheard the same conversations. Id. at 996, 999.

Baraloto objected again during the testimony of his former stepdaughter, Ashley Williams, who for a time had worked at Fast Money. Williams identified Baraloto as Fast Money's "wholesaler" who often "h[u]ng out" at the shop, and agreed that Fast Money's customer base was comprised overwhelmingly of drug addicts who brought in stolen goods. J.A. 1065-66. The district court again overruled Baraloto's evidence objection, providing a careful summary of its reasoning:

> My thinking on this subject is essentially this: Count 2 of the [Second Superseding] Indictment charges . . . Mr. Baraloto . . . with interstate transportation of stolen goods. In order to sustain this charge, the government must prove beyond a reasonable doubt four elements . . . . The two elements that are most pertinent to this line of inquiry are, A, that the goods were stolen, and, B, the defendant's knowledge that the goods were stolen.
>
> The government is entitled to introduce evidence of any tendency to prove that the goods were stolen and this is so under Federal Rule[s] of Evidence 401 and 402, provided that the requirements of 601 and 602 are satisfied, and those are the personal knowledge requirements.

9

The Bradford brothers, Miss Boothe, and to a certain extent, Miss Williams testified as to circumstantial evidence that the goods were stolen. Goods brought in by addicts, original packaging, retail store stickers, the large quantity of health and beauty aids and merchandise brought in by addicts and the fact that the store Fast Money purchased these items at less than retail price, the circumstantial evidence is all perfectly appropriate under 404(2) and 602.

The sticky question is whether the Bradford brothers and Miss Williams can testify as to an opinion that the goods were stolen . . . . Rule 701 states that if the witness is [not] an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are, A, rationally based on the perception of the witness, and here the opinion of the witness is rationally based upon the circumstantial evidence . . . . It would be helpful . . . to the determination of [a] fact in issue, two facts in issue, were the goods stolen and did Mr. Baraloto know about it?

And, C, not based on scientific, technical, or other specialized knowledge and the scope of the 702, seems to me that while working in that kind of establishment is sort of specialized employment, that neither the Bradfords nor [Miss Williams's] testimony would be expert testimony that falls within the scope of 702.

So my view is that the inferences of the Bradford brothers and Miss Williams is properly admitted under Rule 701, so that their testimony to that effect is proper.

Id. at 1056-58. Williams then testified that she believed the goods that Fast Money purchased were stolen, not only because "[r]ealistically, nobody has a hundred bottles of 500-count Tylenol at their house," but also because some of the items

10

"came in with tags from certain retail stores on them, and we took the tags off." Id. at 1060-61.

Michael Ender and Daniel Mimer, who had each worked with Baraloto, testified about the nature of Baraloto's business transactions. Those witnesses related that the customers who sold OTCs and HBAs to the buy/sell shops typically were addicts who needed money for drugs, and who often came in with new, in-the-box items "three, four times a day to cash in." J.A. 1088.

Warren Allen Culver, an associate of Stal, testified that Stal's direct suppliers included Baraloto. Culver described his involvement with the Blue Diamond pawn shop, the venture between Jerome Stal and Baraloto. Culver worked at the shop, primarily because he "knew the medicine side of the business." J.A. 1175. Upon Baraloto's instructions, Culver "sheeted" every transaction that took place at Blue Diamond. Culver stated that, in his mind, he was sheeting the purchase of stolen property.

Finally, the prosecutors called Stal as a witness. Stal discussed his previous convictions for transporting stolen property and related offenses, acknowledging that he served twenty months at the federal prison in Otisville, New York. Stal then described the types of HBAs he was willing to purchase from the buy/sell shops, stating that if the items had reached their sell-by date, he had trouble reselling them to his contacts. Stal confirmed that Baraloto became one of his

11

suppliers around 2007, and that, over time, Baraloto brought in HBAs from three buy/sell shops. Stal kept track of his business dealings, including those involving Baraloto, by entering them into his accounting system. His records from 2006 to 2010 revealed sales in excess of $28.7 million, and purchases (from fences like Baraloto) exceeding $24.4 million. Baraloto was Stal's fifth-largest supplier during that period, responsible for $1.8 million in sales. Describing the buy/sell business, Stal explained that, in his experience, resalable HBAs could be procured in several ways. For example, when new products were introduced, retailers might provide the unsold old products at a discount. Or, one could use coupons to purchase the items at below the retail price. Also, one could secure items from reclamation centers. Stal testified, however, that he had not trafficked in such items, because most of his contacts would not accept goods that were expired or damaged, had been discontinued, or had old UPC codes.

### 3.

The prosecution also presented evidence of a series of wiretapped conversations between Stal and Baraloto. Certain recorded calls confirmed Baraloto's knowledge of Stal's extensive network of customers, and the pair also discussed the status of the HBA business at Blue Diamond, together with the volume of HBA business coming out of Fast Money. The

12

prosecutors ended their direct examination of Stal by playing a wiretapped conversation between him and Baraloto on March 29, 2010, four days after the partners had been arrested:

STAL: Alright. So what are you going to do?

* * *

BARALOTO: . . . I just can't see my life ah any other way you know, and I, I can't, I can't go to prison and even if I could go to prison, I couldn't live outside of prison with the restrictions of a felony conviction, you know I can't do it.

STAL: Ah it ain't that bad.

* * *

Oh, what Scott [Bradford] say, he knows nothing?

BARALOTO: Yeah, Scott . . . , optimistic that ah, that he'll get off it so I guess he didn't do anything. I'm just not, not that optimistic I don't, I don't know if I said something to somebody somewhere you know off the cuff. I don't remember every conversation I ever had with everybody.

STAL: Right.

BARALOTO: You know they twist my words to make it sound like I said any fucking thing.

STAL: I'll fess that they're good at that. Just wait and see man don't ahh don't get all excited yet.

BARALOTO: I know, you know I'm just, you know contemplating the possibilities you know what, the way you know I'll, I'll wait to see what the affidavit says and if it says something ridiculous then you know then I, I'll feel like I can beat it or have a chance that's one thing, you know but if it's something I can't beat . . . .

* * *

13

STAL: I last spoke to my lawyer he said, he said we're not going to see anything for at least two to three months.

* * *

BARALOTO: What about the right to a speedy trial? Jesus Christ, haha.

STAL: You can't go to trial man they'll kill ya. They'll kill ya man. I'm telling ya.

BARALOTO: Yeah.

Id. at 113-16.

4.

During the defense's cross-examination of Stal, Baraloto presented the transcript of a telephone call that the government had not introduced into evidence. That March 27, 2010 conversation, which contained Baraloto's statements to Stal and Stal's responses, was proffered to show that Baraloto did not know that the goods he dealt in were stolen. The transcript of this call reflects that Baraloto told Stal,

they're trying to say like . . . we knew, any of this shit was stolen. Well that's not true; I mean how could we be sure. You know people make, people that I bought stuff from told me that in fact it wasn't — they'd show me their sheets or the stickers on the shit that corresponded with the police report.

* * *

Well, I never witnessed anybody ever steal anything. I never, nobody ever told me that anything was stolen how could I have ever know something was unless I saw it or someone told me? You know, it's just bullshit.

J.A. 1495.

14

The district court allowed Baraloto to introduce this call, not as substantive evidence of his alleged absence of knowledge, but as "arguably a prior inconsistent statement [of Stal's] under [Rule] 613." J.A. 1500; see id. at 1517 (court's instruction to jury). The relevant portion was played to the jury, and Stal acknowledged that he understood Baraloto to be asserting his alleged belief that the items they dealt in had not been stolen.

B.

At the close of the government's case-in-chief, Baraloto moved for judgments of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, arguing that "the Government has relied on certain 'suspicious' circumstances to prove" that Baraloto knew that the merchandise he dealt with was stolen, and that such evidence was legally insufficient to show actual knowledge. J.A. 1579. The district court denied the motion, explaining that "[a] number of witnesses testified that the shops attracted addicts seeking immediate cash with which to purchase drugs. Mr. Baraloto, who spent considerable time in the shops, especially Fast Money, was in a position to observe this fact." Id. at 1672.

During the charge conference, the district court reviewed and considered the government's request for a willful blindness instruction, to which Baraloto objected. The court declined to

15

give the instruction, expressing its view that the evidence tended to prove actual knowledge, rather than a deliberate closing of eyes. See J.A. 1685. The charge specified that the prosecution must prove each element of each offense beyond a reasonable doubt. In explaining the concepts of knowledge and intent, the court recited that Baraloto "may be found guilty only if he acted willfully, intentionally, and with knowledge." Id. at 1730. The court also instructed that "[t]he defendant's conduct is not willful if it was due to negligence, inadvertence, or mistake." Id. at 1732.

On December 9, 2011, the jury convicted Baraloto on all four offenses. On March 29, 2012, Baraloto renewed his motion for judgments of acquittal, advancing essentially the same arguments he had raised pre-verdict. The court again denied the motion, and, on June 29, 2012, sentenced Baraloto to fifty-six months in prison. Baraloto timely noticed this appeal. We possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We review challenges to a district court's evidentiary rulings only to ensure that the court did not abuse its discretion. See United States v. Perkins, 470 F.3d 150, 155 (4th Cir. 2006). "A court has abused its discretion if its decision is guided by erroneous legal principles or rests upon a

16

clearly erroneous factual finding." Brown v. Nucor Corp., 576 F.3d 149, 161 (4th Cir. 2009) (citation and internal quotation marks omitted). Evidentiary rulings are also subject to harmless error review, such that we will not reverse if we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." United States v. Brooks, 111 F.3d 365, 371 (4th Cir. 1997) (citation omitted).

A defendant challenging the sufficiency of the evidence used to convict him faces a heavy burden. See United States v. Beidler, 110 F.3d 1064, 1067 (4th Cir. 1997). A jury's verdict commands the respect of an appellate court, and must be sustained if there is substantial evidence to support it. See United States v. Wilson, 198 F.3d 467, 469 (4th Cir. 1999). Substantial evidence has been defined, in the criminal context, as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Smith, 451 F.3d 209, 216 (4th Cir. 2006) (internal quotation marks omitted). Furthermore, "[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented." Beidler, 110 F.3d at 1067 (internal quotation marks omitted). Finally, "[r]eversal for

17

insufficient evidence is reserved for the rare case where the prosecution's failure is clear." Id. (internal quotation marks omitted).

### III.

In this appeal, Baraloto contends that the district court committed prejudicial error by permitting several lay witnesses to express their opinions that the goods being trafficked by Baraloto and Fast Money had been stolen. Baraloto insists, moreover, that the evidence against him at trial was insufficient to establish an essential element of each offense, namely, that Baraloto knew he was dealing in, and conspiring to deal in, stolen goods.

### A.

Baraloto maintains that the lay witnesses' testimony that Fast Money dealt in stolen goods was not based on personal knowledge. He suggests that this evidence was improperly admitted because the witnesses — Jerald Bradford, Ashley Williams, Warren Culver, Daniel Mimer, Michael Ender, and Jerome Stal — were not offered as experts, yet were permitted to testify on the basis of assumptions predicated on appearance, quantity, and price of goods, and on the characteristics of the sellers.

18

As spelled out below, we reject the contention that the prosecution's witnesses improperly gave their opinions about whether items eventually sold to Baraloto were stolen. Federal Rule of Evidence 701 provides for the admission of lay opinion testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge [for which an expert would be required]." As we have explained, the line between lay opinion testimony and expert testimony "is a fine one," because "Rule 701 does not distinguish between expert and lay witnesses, but rather between expert and lay testimony." United States v. Perkins, 470 F.3d 150, 155 (4th Cir. 2006) (internal quotation marks omitted). In Perkins, we recognized that

> [a]s an example of the kinds of distinctions that Rule 701 makes, the [Advisory] Committee instructs that the rule would permit a lay witness with personal experience to testify that a substance appeared to be blood, but that it would not allow a lay witness to testify that bruising around the eyes is indicative of skull trauma.

Id. Unlike the prerequisites for an expert witness under Rule 702, a lay witness is not required to "'possess some specialized knowledge or skill or education that is not in possession of the jurors.'" Id. (quoting Certain Underwriters at Lloyd's, London v. Sinkovich, 232 F.3d 200, 203 (4th Cir. 2000)). Rather, "a

19

lay opinion must be the product of reasoning processes familiar to the average person in everyday life." United States v. Yanez Sosa, 513 F.3d 194, 200 (5th Cir. 2008) (internal quotation marks omitted).

Recently, in United States v. Mendiola, one of our sister circuits reiterated that the perceptions of a lay witness must be based on knowledge, and not on speculation. See 707 F.3d 735, 741 (7th Cir. 2013). Such knowledge need not be "absolute or unlimited[, however,] but simply that awareness of objects or events that begins with sensory perception of them, a comprehension of them, and an ability to testify at trial about them." Id. In Baraloto's case, the prosecution's lay witnesses readily satisfied the applicable standard. They had witnessed numerous transactions pertaining to Baraloto's buy/sell retail business, and through these encounters were amply aware of the nature and conventions of that stolen goods enterprise. When persons known to be drug addicts repeatedly entered Fast Money with thousands of dollars worth of OTCs and HBAs, and proceeded to sell such items for pennies on the dollar, any reasonable observer could conclude, as a matter of common sense, that the goods were stolen. Thus, the lay witnesses' testimony

20

concerning the stolen nature of the goods was properly admitted and the trial court did not abuse its discretion.[4]

B.

We also reject Baraloto's challenge to the sufficiency of the evidence. The government presented abundant evidence, direct and circumstantial, upon which the convictions can be sustained. The witnesses explained the nature of Baraloto's business — a multi-million dollar stolen goods enterprise that preyed upon drug addicts who were desperate for quick cash. The enterprise perpetuated the theft and disposition of stolen goods, and it interrupted commerce. The government also presented telephone conversations between Baraloto and his partner, Stal, where Baraloto was not surprised that he had been charged with the interstate transportation of stolen goods, telling Stal that he was "not optimistic" and that he would not make any decisions until he received discovery in his criminal case.

---

[4] Aside from the opinion testimony that the goods were stolen, Amber Boothe, a former drug addict and shoplifter, testified that she routinely stole HBAs from retail stores and sold them immediately to Fast Money. Boothe also confirmed that, from her time at Fast Money, she recognized Baraloto as a visitor to the store. Boothe's testimony alone created a triable question of fact concerning whether Baraloto knew the goods were stolen.

The witnesses consistently confirmed that they knew, based primarily on common sense, that the goods Baraloto was purchasing and selling were stolen. There was ample evidence for the jury to find that Baraloto, who dealt regularly with the witnesses — and who perceived the same circumstances and conducted the same transactions as had each of them — must have come to the same conclusion. See United States v. Beidler, 110 F.3d 1064, 1068 (4th Cir. 1997) (recognizing that "'knowledge of illegality may be proven by circumstantial evidence'" and "'by drawing reasonable inferences from the evidence of defendant's conduct'" (quoting Ratzlaf v. United States, 510 U.S. 135, 149 n.19 (1994))).

Baraloto seeks support on his sufficiency contention from our decision in United States v. Ebert, which reversed the convictions of multiple defendants who were found guilty of money laundering and receiving stolen goods — namely OTCs and HBAs. See No. 96-4871, 1999 WL 261590 (4th Cir. 1999) (unpublished). Ebert, however, is non-precedential and readily distinguishable. That prosecution was based on the theory of willful blindness, and we determined that the court had improperly instructed the jury in that regard. Instead of pointing to witnesses who knew the goods were stolen, the government presented "highly suspicious circumstances" to the jury, including "plain brown boxes" and low prices, to prove

22

that the defendants were deliberately ignorant of the stolen goods. See id. at *13, 22. Here, the district court properly recognized in its December 2, 2011 Memorandum to Counsel that, in Ebert, "[t]here was . . . no evidence that the defendants had direct knowledge" of the stolen nature of the goods. J.A. 1670. The prosecution's case against Baraloto on the stolen nature of the goods was much more substantial, and the trial court declined to instruct on willful blindness, correctly explaining that the evidence tended to prove actual knowledge, rather than willful blindness. See id. at 1685. Indeed, there was an abundance of direct and circumstantial proof that the goods Baraloto bought and resold had been stolen, and more than enough evidence for the jury to conclude that Baraloto knew that he was dealing in, and conspiring to deal in, stolen goods.

IV.

Pursuant to the foregoing, the judgment of the district court is affirmed.

AFFIRMED

GREGORY, Circuit Judge, dissenting:

The majority is absolutely right, "[a] jury's verdict commands the respect of an appellate court." Ante 17. In fact, jury trials are "fundamental to the American scheme of justice." Duncan v. State of La., 391 U.S. 145, 149 (1968). When the Government, therefore, infuses a case with impermissible evidence in order to attain a favorable jury verdict, not only does the Government undermine the province of the jury, it also destabilizes the entire justice system. In an effort to convict Mr. Baraloto of knowingly transporting and conspiring to transport stolen goods, the Government played on prevalent misperceptions of "urban" America, piling inference upon inference in order to "prove" both that the goods Baraloto was dealing were stolen and that Baraloto had actual knowledge of this fact. The Government unabashedly relied on conjecture to meet its constitutional burden of proof. I must dissent.

I.

To convict Baraloto of transporting, and conspiring to transport stolen goods, the Government had to prove beyond a reasonable doubt that: (1) the goods were stolen; (2) Baraloto transported the goods or caused them to be transported; (3) at the time of transportation, Baraloto knew the goods were stolen; and (4) the value of the stolen property was $5000 or more. The

24

Government went about proving the first and third elements in large part by eliciting testimony from Fast Money's owners, employees, associates, and clientele, all of whom opined in some regard that Fast Money's customer base consisted of drug addicts who were necessarily dealing in stolen goods. Ante 6-12. Baraloto objected to this testimony, "maintain[ing] that the lay witnesses' testimony that Fast Money dealt in stolen goods was not based on personal knowledge." Ante 18. At least seven Government witnesses – Jerald Bradford, Scott Bradford, Ashley Williams, Warren Culver, Daniel Mimer, Michael Ender, and Jerome Stal – testified to the effect it was their belief that drug addicts stole goods to sell at Fast Money (and other neighborhood pawn shops). Baraloto argued this testimony violated Federal Rules of Evidence 602 and 701. Baraloto was right.

## II.

Federal Rule of Evidence 602 declares "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." (Emphasis added). The only testimony excepted from the personal knowledge requirement is expert testimony. The majority does not contend the disputed testimony falls under the expert testimony exception. Instead, it concludes that the

25

disputed testimony was admissible as lay witness opinion testimony under Federal Rule of Evidence 701. Opinion testimony allowed under Rule 701 is limited to testimony that is: "(a) rationally based on the witness's perception; (b) helpful to clearly understand[] the witness's testimony or to determin[e] a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. In hope that the same evidentiary errors are not repeated going forward, I provide a more comprehensive analysis of what Rule 701 permits generally, and then hone in on Rule 701's application to the facts of this case.

### A.

We have said in the past that Rule 701 "allows testimony based on the person's reasoning and opinions about witnessed events, such as are familiar in every day life." United States v. Offill, 666 F.3d 168, 177 (4th Cir. 2011). Beyond this amorphous statement, our guidance has been scant. It is important to note, however, that nothing in Rule 701 exempts lay opinion testimony from the personal knowledge requirement found in Rule 602. Quite contrary, "[t]he requirement that lay opinion be based on the perception of the witness imports into Rule 701 the personal knowledge standard of Rule 602." United States v. Mendiola, 707 F.3d 735, 741 (7th Cir. 2013) (citing

26

*United States v. Bush*, 405 F.3d 909, 916, n. 2 (10th Cir. 2005)).

While there may be some ambiguity as to what comprises a "rationally based opinion," at a minimum, Rule 701 lay opinion testimony requires a proper foundation to be laid, demonstrating the witness has "personal knowledge of the facts from which the opinion is derived." *U.S. v. Carlock*, 806 F.2d 535, 551 (5th Cir. 1986). The burden is on the party wishing to introduce lay opinion testimony, i.e., the Government, to establish this foundation. *U.S. v. Grinage*, 390 F.3d 746, 749 (2d Cir. 2004). In laying a proper foundation, "[t]he nature and extent of the contacts and observations" are important. *United States v. Pickett*, 470 F.2d 1255, 1258 (D.C. Cir. 1972) (emphasis added). Therefore, in order for a court to admit lay opinion testimony, it "must find that the witness' testimony is based upon his or her personal observation and recollection of concrete facts." *United States v. Jackson*, 688 F.2d 1121, 1124 (7th Cir. 1982) (emphasis added) (citing *United States v. Skeet*, 665 F.2d 938, 985 (9th Cir. 1982)). If the witness does not provide a proper basis for his opinion, then the testimony is not admissible under Rule 701. *See United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992).

Once a proper foundation for opinion testimony is laid, the Government must establish a rational connection between the

27

"opinion and the observed factual basis from which it is derived." Carlock, 806 F.2d at 551. This connection, or "reasonable inference" as some courts call it, must be one "that a normal person might draw from those observations." Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc., 630 F.2d 250, 264 (5th Cir. 1980). However, where a lay opinion is formed outside the realm of "common experience," United States v. Paiva, 892 F.2d 148, 157 (1st Cir. 1989) -- where the average person could not form the same opinion based on the observed concrete facts, more is required to establish an adequate connection. In these instances, witnesses must explain their specialized experience with the subject of their lay opinion testimony. See, e.g., United States v. Williams, 212 F.3d 1305, 1310 (D.C. Cir. 2000) (district court erred in allowing officer who lacked sufficient experience to testify it is common for drug users to carry weapons). "Though particular educational training is of course not necessary, the court should require the proponent of the testimony to show some connection between the special knowledge or experience of the witness, however acquired, and the witness's opinion regarding the disputed factual issues in the case." Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190, 1202 (3d Cir. 1995).

At bottom, if lay opinion testimony is not adequately scrutinized before it is admitted, it runs the risk of

implanting into a juror's mind the conclusion that he or she is to draw from the facts presented. See United States v. Sanabaria, 645 F.3d 505, 515 (1st Cir. 2011). It is for this reason that lay opinion testimony will "probably be more helpful when the inference of knowledge is to be drawn not from observed events or communications that can be adequately described to the jury . . . ." Rea, 958 F.2d at 1216 (emphasis added) (citing United States v. Fowler, 932 F.2d 306, 312 (4th Cir. 1991)). Thus, lay opinion testimony should be used only in the instances where the "witness cannot adequately communicate to the jury the facts upon which his or her opinion is based," Jackson, 688 F.2d at 1124 (citing Skeet, 665 F.2d at 985), as "Rule 701 simply recognizes lay opinion as an acceptable 'shorthand' for the 'rendition of facts that the witness personally perceived.'" United States v. Garcia, 413 F.3d 201, 211 (2d Cir. 2005) (citing 4 Weinstein's Federal Evidence § 701.03[1]); see also Fed. R. Evid. 701 advisory comm. note (Rule 701 "retains the traditional objective of putting the trier of fact in possession of an accurate reproduction of the event").

B.

An adequate foundation of personal knowledge is especially important when it comes to providing lay opinion testimony about drug use and addiction. The average person may have little or no experience with drugs, and therefore this testimony falls out

of the realm of "common experience."  Paiva, 892 F.2d at 157.

An adequate foundation necessary for drug opinion testimony may include a witness's "prior use and knowledge of [a] drug and his sampling of the substance which he identified, coupled with his statement that the drug [he testified about] affected him in the same manner as the drug he had previously ingested."  United States v. Sweeney, 688 F.2d 1131, 1145 (7th Cir. 1982).  Or, a witness may give his lay opinion that a particular substance is a certain drug, "so long as a foundation of familiarity with the substance is established."  United States v. Durham, 464 F.3d 976, 982 (9th Cir. 2006).  For example, the Eighth Circuit held the lay opinion of a witness who identified a substance she consumed as amphetamine was inadmissible because she had no experience with the drug; however, the lay opinion of two other witnesses who had previously used amphetamine was admissible. United States v. Westbrook, 896 F.2d 330, 336 (8th Cir. 1990).

To give another example of valid lay opinion testimony, a lay witness may opine under Rule 701 that a person is under the influence of alcohol – this is within the realm of "common experience."  See United States v. Mastberg, 503 F.2d 465, 470 (9th Cir. 1974) (allowing testimony that person appeared under the influence of alcohol); see also Asplundh Mfg. Div., 57 F.3d at 1196 (same).  Conversely, lay witnesses are "not sufficiently knowledgeable about common symptoms of drug consumption," and

30

therefore cannot testify that a person was under the influence of drugs without providing a foundation for the basis of their knowledge. State v. Nobach, 46 P.3d 618, 622 (Mont. 2001) (with a lay opinion testimony rule that directly tracks the language of Rule 701); cf. Sanders v. United States, 373 U.S. 1, 20 (1963) ("Whether or not petitioner [testifying at trial] was under the influence of narcotics would not necessarily have been apparent to the trial judge.").

In line with general evidentiary principles, the amount of prior experience that is sufficient for an adequate foundation should be left to the discretion of the trial judge. Harris v. Dist. of Columbia, 601 A.2d 21, 24 n.3 (D.C. 1991). However, the bottom line is that a witness must establish some prior experience for the testimony to be admissible under Rule 701; conclusory statements are not adequate. See Pedraza v. Jones, 71 F.3d 194, 197 (5th Cir. 1995); Kurina v. Thieret, 853 F.2d 1409 (7th Cir. 1988). But see United States v. Spriggs, 996 F.2d 320, 325 (D.C. Cir. 1993) (detective's opinion about effects of drug use was admissible because of his experience with drug addicts).

### III.

Now that the contours of Rule 701 generally and in relation to drug testimony are adequately explained, I turn to the

31

testimony in this case.  I am mindful that we review a district court's evidentiary rulings for abuse of discretion.  Ante 16 (citing United States v. Perkins, 470 F.3d 150, 155 (4th Cir. 2006).  This deferential standard of review does not require us, however, to kowtow to a district court's reasoning behind its evidentiary rulings when the rulings rest on an erroneous application of the law, as it is clear that "[a]n error of law is, by definition, an abuse of discretion."  United States v. Basham, 561 F.3d 302, 325-26 (4th Cir. 2009) (internal citations omitted).  As shown below, the lay opinion testimony objected to by Baraloto fails to meet the requirements of Rule 701.  Thus, the testimony is insufficient as a matter of law, and as such, the district court abused its discretion by admitting it.

A.

Only one witness, Amanda Boothe, testified personally to her drug use and to the fact that she sold stolen goods at Fast Money.[*]  The testimony of the witnesses detailed below, however, expands beyond personal knowledge, requiring a number of logical leaps outside the realm of common experience.  And because the Government did not, and probably could not, lay adequate

_____

[*] While Amanda Boothe's testimony may possibly be sufficient to fend off Baraloto's sufficiency of the evidence challenge, see ante 21 n.4, this does not effect the harmless error analysis conducted below, see infra Part IV.

32

foundation for this unrepressed testimony, it does not meet the requirements of Rule 701.

1.

First, the vague testimony regarding the number of drug addicts at Fast Money is inadmissible. One employee of Fast Money made no mention of customers having physical signs of drug use, while others said that almost every customer that walked through Fast Money's doors had physical markings indicating drug use. For instance, Jerald Bradford, owner of Fast Money, surmised that 90% of Fast Money's clientele were drug addicts. J.A. 878. He said he could tell "usually from IV, the needle marks on their arms, skin pops, stuff like that." Id. Using similar reasoning, his brother, Scott Bradford, testified Fast Money clients were drug abusers because "[s]ome of them had obvious marks on their body, arms, and some were actually bending over, they call it nodding out, to where they can't even stand up." J.A. 994. And Ashley Williams, Jerald Bradford's step-daughter who worked at Fast Money, also said that she knew 90% of Fast Money's customers were drug addicts because "[t]hey just have the look of sores on them." J.A. 1055. On the other hand, another Fast Money employee, Michael Ender, testified that the "[p]eople were on drugs and need[ed] money," J.A. 1087, but never testified to witnessing any signs of drug use or addiction and did not testify to knowing any of the customers personally.

33

Leaving the inconsistencies in the testimony aside, there was no foundation laid by any of the witnesses allowing them to testify as to a group of customers' drug addiction. None of the witnesses testified to having special knowledge of any drugs of any kind. There was nothing adduced at trial to explain how these witnesses knew what was consistent behavior with that of a drug addict, nor how they knew what physical signs were consistent with drug use. No specifics were given regarding who was using drugs. And not one drug addict that sold OTC/HBAs (other than Boothe) was identified with any certainty. There is no indication that any of the Fast Money witnesses interacted with these drug addicted customers on a regular basis, and in fact, there is testimony to the contrary. See, e.g., J.A. 1054 (Testimony of Ashley Williams) (testifying she interacted with customers "every once in a while"). This testimony lacks the adequate foundation necessary for Rule 701 lay opinion testimony regarding drug use.

The witnesses should have been allowed to testify as to what they personally observed, that is permissible under Rule 701. They should have been prohibited, however, from drawing a conclusion that these physical signs they witnessed were evidence of drug addiction without providing a concrete explanation as to how they knew these observations were indicators of drug use or addiction. See United States v. Noel,

34

581 F.3d 490, 496 (7th Cir. 2009) ("[A] lay witness's purpose is to inform the jury what is in the evidence, not to tell it what inferences to draw from that evidence."). To allow witnesses to make sprawling affirmations categorizing Fast Money's client base as drug addicts with no specifics to support this testimony violates Rule 701. These vast generalizations are not based on sufficient personal knowledge.

2.

Even assuming the opinion testimony regarding Fast Money's clientele's overwhelming rate of drug addiction was permissible under Rule 701, this was not the only inference at play in this case. If one impermissible inference was not enough, the witnesses then had to conclude that the drug addicts necessarily transacted in stolen goods to support their drug habit. This additional layer of inference goes beyond the bounds of permissible extrapolation based on first-hand perception and into the realm of pure speculation.

Multiple witnesses testified openly to their stereotypical belief that all drug addicts were desperate for money and therefore had to steal to support their habit. See, e.g., J.A. 941 (Testimony of Jerald Bradford) (when asked if he thinks people on drugs steal, he responded "[y]ou can say I am a skeptic"); J.A. 1093 (Testimony of Michael Ender) ("People that were on drugs and need money, so they were out doing what they

35

had to do [i.e., steal]"); J.A. 1121 (Testimony of Daniel Mimer) (calling customers "drug addicts, people who needed cash for, you know, control their habits"); J.A. 1325, 1428 (Testimony of Jerome Stal) (calling customers "crackheads" who were "in need of money"). This testimony has nothing to do with the witnesses' personal observations, a fundamental requirement of Rule 701.

The inferences drawn in this case were hardly reasonable -- I was unaware that the only way drug addicts could support their drug habit was to steal, in bulk, "thousands of dollars" of over-the-counter health beauty aids (an amazing feat in itself), and turn around and sell the stolen goods for "pennies on the dollar" at Fast Money pawn shop. Ante 20. Drug addicts do not solely reside in "high crime" neighborhoods as the one here, allowing for such stark generalizations. Drug addiction is an unfortunate affliction affecting every segment of society. See, e.g., John Byrne, New High Finance: Wall Street Drug Use Soars, N.Y. Post, Mar. 17, 2013, http://www.nypost.com/p/news/business/new_high_finance_gF1594vGb hI1i0FYSliCBL. It surely cannot be that all drug users steal, given that drug users come in all hues and creeds. Drug addiction is not a uniform affliction with a certain set of character traits pre-attached. Yet the Government lumped together Fast Money's customers, and through the inadmissible

36

lay opinion testimony painted with a broad-brush what these (alleged) drug addicted customers likely can or cannot do.

Outside of pure speculation, the only evidence provided as the basis for the witnesses' opinion that the goods sold at Fast Money were stolen was the fact that the goods still had stickers on them, see J.A. 1056 (Testimony of Ashley Williams), and that the items were sold at low prices, see J.A. 1179-80 (Testimony of Warren Culver). This evidence is just as consistent, however, with the "entirely innocuous" aspects of a secondary OTC/HBA market. United States v. Ebert, No. 96-4871, 1999 WL 261590, at *13, *22 (4th Cir. 1999) (unpublished). As such, they cannot be the basis for personal knowledge that the goods were stolen.

The Government, in large part, went about proving that Fast Money dealt in stolen goods by allowing witnesses to opine that drug addicts in this neighborhood were poor and desperate, and therefore had to steal as a condition subsequent. I balk at the notion that a witness could testify as a matter of personal knowledge that goods were stolen solely because of a person's perceived economic circumstance and supposed drug addiction. This testimony not only fails to satisfy Rule 701, in my opinion, it also allows "the very stereotype the law condemns." Powers v. Ohio, 499 U.S. 400, 410 (1991).

And if it was not clear that the Government was relying on conjecture and stereotype to prove its case, it then introduced similar testimony from three witnesses who testified that stolen goods were sold by drug addicts at other area pawn shops. Not only did their testimony suffer the same fatal flaws as the testimony above, even more troubling is the lack of relevance of the testimony as to whether Fast Money's goods were stolen and Baraloto's knowledge of this fact.

Warren Culver was allowed to testify, over Baraloto's objection, that the goods sold at TS Liquidators (a neighborhood pawn shop), were stolen because "there's no other way you could possibly get that stuff to sell that cheap." J.A. 1179-80. Likewise, Daniel Mimer never testified to going to Fast Money, but did work at another neighborhood pawn shop, "We Buy," and was permitted to give his opinion that We Buy's clientele were "basically drug addicts, people who needed cash for, you know, control their habits, basically." J.A. 1121. Mimer never saw Baraloto at We Buy. Finally, Jerome Stal, who worked at "EZ Money" – another pawn shop in the area, gave opinion testimony characterizing the goods sold at EZ Money as stolen. The Government had Stal read into the record the following sign displayed at EZ Money as notice for its employees:

> This goes for everyone here. Regardless of what some of our customers may decide to do with their time and money when they [visit] this store, we have no right to criticize them for their decisions. The next employee that calls a customer a junkie, drug addict, dope fiend, et cetera, will no longer have a job. Remember, these people make sure that we have money at the end of the week.

J.A. 1319. And when asked by the Government if EZ Money's customers were the type to engage in couponing or any other legitimate means of transacting in the OTC/HBA secondary market, Stal said no, "The people that I saw . . . didn't seem the type of person that they're disciplined to go do this for hours and hours and come into a pawn shop and sell it to the pawn shop." J.A. 1396. This testimony was not only flawed under Rule 701, but it was irrelevant and prejudicial under Rules 401 and 403. The testimony was inadmissible.

***

In short, the conclusions of at least seven Government witnesses relied on multiple inferences centered on stereotypical portrayals of urban blight. The testimony was not based on the witnesses' first-hand perception and did not have an adequate foundation as required by Rule 701. Nor was much of the testimony relevant to what the Government was <u>required</u> to prove in this case. The admission of this line of testimony runs afoul of the Federal Rules of Evidence, and as such, the

39

district court erred as a matter of law by allowing this testimony into evidence.

B.

The story woven throughout the lay opinion testimony is clear. Fast Money is located in a dangerous, drug-ridden Baltimore neighborhood. See ante 6 (Fast Money was in a "[v]ery rough [neighborhood], [with] a lot of drugs, [and] homicides"). Given this community, it is no surprise that most, if not all, of Fast Money's customers were not only drug users, but drug addicts. See ante 6-7. ("[A]bout 90% of [Fast Money's] clientele was comprised of drug addicts"). And because the drug addicts in this rough neighborhood are not only poor, but exceedingly unruly, there is no legitimate means by which Fast Money's clientele could partake in the secondary OTC/HBA market. See ante 11 (Fast Money's clientele consisted "typically, of drug addicts who needed money for drugs"); Appellee's Br. 51 (who did not have "the capital or the discipline to engage in organized couponing"). As such, anyone with a pair of eyes and functioning brain knew Fast Money was transacting in stolen goods.

Based on this simplistic stereotype-based narrative, "any reasonable observer could conclude, as a matter of common sense, that the goods were stolen." Ante 20. And from here, a juror could conclude, as a matter of "common sense," that Baraloto

40

knew the goods were stolen. But taking a step back, these so-called "common sense" conclusions required the witnesses to make a number of logical leaps to form their opinions, skirting around the personal knowledge requirement found in the Federal Rules of Evidence. These "common sense" conclusions amount to nothing more than speculation and stereotype based on socio-economic status, geographic location, and personal appearance. This line of reasoning is dangerous – I do not see what would stop the Government from indicting and convicting any person who conducted business at Fast Money or a similar neighborhood pawn shop. It is for this reason that allowing a witness to base his or her opinion on "common sense" is speculation not grounded on personal observations. See United States v. Whitworth, 856 F.2d 1268, 1284-85 (9th Cir. 1988). Admitting this testimony regarding both customer addiction and their belief that customers were selling stolen goods fails to satisfy the requirements of Rule 701.

C.

As a matter of principle, I find it extremely objectionable what the Government did here. The poverty and appearance of Fast Money's customers was not probative, let alone dispositive, in determining the key question at hand – whether the goods sold at Fast Money were stolen; and it is wholly irrelevant to whether Baraloto knew the goods were stolen. But still the

41

Government relied on this testimony, most probably because "[t]he impact of narcotics addiction evidence upon a jury of laymen is catastrophic . . . the public . . . has been taught to loathe those who have anything to do with illegal narcotics." Washington v. LeFever, 690 P.2d 574, 577 (Wash. 1984) (en banc). And apparently goaded by the district judge's assertion that the Government is "entitled to introduce evidence of any tendency to prove that the goods were stolen," ante 9, the Government presented a case bereft of evidence that would actually tend to prove the goods sold at Fast Money were stolen. There were no reports of neighborhood OTC/HBA crime waves. Store logs were not reproduced evincing OTC/HBAs were stolen and subsequently sold at Fast Money. Evidence such as this may have been helpful to the jury in deciding whether Fast Money dealt in stolen goods. Instead, the Government's case hinged on "factors . . . wholly unrelated to the blameworthiness of [Baraloto]." Booth v. Maryland, 482 U.S. 496, 504 (1987). While the Government may have been "entitled," or more accurately, required, to prove its case, this "entitlement" is necessarily limited by the Federal Rules of Evidence, which the Government did not adhere to.

## IV.

With the errors finally revealed, Baraloto still must overcome harmless error review, because "we will not reverse if

42

we can say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" Ante 17 (quoting United States v. Brooks, 111 F.3d 365, 371 (4th Cir. 1997)). There is no doubt in my mind that the repeated evidentiary errors "substantially swayed" the jury's verdict, warranting a new trial under the cumulative error doctrine. See United States v. Lighty, 616 F.3d 321, 371 (4th Cir. 2010).

We have previously noted that "[i]f more than one error occurred at trial, then all errors are aggregated to determine whether their cumulative effect mandates reversal." United States v. Montague, 202 F.3d 261 (4th Cir. 2000) (unpublished table decision); see also United States v. Basham, 561 F.3d 302, 330 (4th Cir. 2009) (explaining the cumulative error doctrine). This aggregation is necessary because "[a] column of errors may sometimes have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts." United States v. Sampson, 486 F.3d 13, 51 (1st Cir. 2007) (internal citations omitted).

Baraloto is not the victim of an isolated evidentiary error. The district court allowed at least seven witnesses to repeatedly opine about matters of which they had no personal knowledge. The aggregation of the errors in this case had a grave impact. As the district court acceded, this repetitive

43

lay opinion testimony was "pertinent" to the Government proving both that Baraloto transacted in stolen goods and that he had personal knowledge the goods were stolen, see ante 9 -- the two most contentious elements of the Government's case. To boot, the Government's proof that Baraloto knew the goods he transacted in were stolen rested entirely on circumstantial evidence. Without this testimony the Government's case against Baraloto would have been flimsy at best.

The pervasive and impermissible use of lay opinion testimony in this case "so fatally infect[ed] the trial that [it] violated the trial's fundamental fairness." United States v. Basham, 561 F.3d 302, 330 (4th Cir. 2009) (quoting United States v. Bell, 367 F.3d 452, 471 (5th Cir. 2004)). The inadmissible testimony permeated the Government's case and was the Government's modus operandi for proving Baraloto's guilt. There was not a significant amount of evidence outside of the impermissible lay testimony inculpating Baraloto. But cf. United States v. Banks, 482 F.3d 733, 741-42 (4th Cir. 2007) (the substantial inculpatory evidence rendered any error harmless). The Government's case was constructed around this testimony and the timeworn story it relayed. Pursuant to the cumulative error doctrine, therefore, the mountain of evidentiary errors in this case warrants a new trial.

44

V.

The lay opinion testimony in this case was not based on the witnesses' first-hand perception as required by Rule 701. Instead, the testimony was an amassment of inferences capitalizing on an all-too-familiar story. Given the pervasive nature of the impermissible lay opinion testimony in this case, I would reverse and remand for a new trial due to evidentiary errors. I respectfully, but firmly, dissent.