In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-1595

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CARLOS MENDIOLA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 825-2—**Robert W. Gettleman,** *Judge.*

ARGUED JANUARY 6, 2011—DECIDED FEBRUARY 11, 2013

Before EASTERBROOK, *Chief Judge*, and CUDAHY and
ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. A Spanish-speaking linguist
working for the Drug Enforcement Administration (DEA)
listened to recordings of Carlos Mendiola's prison tele-
phone conversations prior to testifying before a jury
that Mendiola's voice was likely the one on several
wiretapped calls in which Mendiola and others planned
a large-scale cocaine deal. Mendiola appeals his convic-

tion, arguing that the linguist's testimony constituted impermissible opinion testimony under the Federal Rules of Evidence and violated the Best Evidence Rule to boot. Finding neither of these arguments holds sway, we affirm.

DEA agents suspicious of Alfredo Galindo Villalobos (Galindo) began legally monitoring his telephone conversations in September 2006. Through these conversations, the agents learned that Galindo was trafficking in drugs with someone whose name was Carlos, but who went by the nickname "Pelon." They also discovered that Galindo and Carlos were expecting a large shipment of cocaine from Mexico to be delivered to them in Chicago. In the late morning of November 1, 2002, agents observed a blue Ford Explorer linked to Galindo in the vicinity of a bus station on the southwest side of Chicago. Agents knew that a bus was scheduled to arrive that morning from a border city in Texas. Galindo, the driver, and his passenger, Mendiola, picked up three men from the bus, two of whom were carrying duffel bags. During a subsequent traffic stop, Galindo and Mendiola each produced Florida driver's licenses with matching addresses. The back seat passengers were later identified as Jose Valadez, Ricardo Mendoza, and Juan Diaz-Casales. After all the occupants of the car consented to a search, the police discovered approximately 5,000 grams of cocaine and three pairs of pants containing hidden pockets filled with cocaine. In order to continue their investigation and ferret out more participants, the officers staged what they refer to as a "rip." They acted as though they were dirty cops con-

fiscating the cocaine they found for themselves in exchange for releasing the dealers. The plan worked, and three weeks later the agents engaged in a nationwide "takedown" in order to arrest members of the drug trafficking organization, execute warrants, and seize drugs and vehicles, including the blue Ford Explorer and a white Lexus, both of which were found on the street near Mendiola's residence and both of which contained hidden compartments secreting cocaine. After agents gave Mendiola his *Miranda* warnings, he told officers that the drugs in the car belonged to Galindo and that Galindo had given the drugs to him because there was "some kind of problem with the quality," and that he had forgotten about them because they had been in the car for some time.

Galindo, Mendoza, and Valadez all pleaded guilty to conspiracy and testified at Mendiola's trial, implicating him as an active participant in the conspiracy to import and distribute multiple kilograms of cocaine. Rubiel Mendiola, the defendant's brother who was also arrested and implicated, and Juan Diaz-Casales are fugitives and have not been found. Each of the other three co-conspirators testified that Mendiola recruited Mendoza and Valadez to smuggle cocaine from Mexico to Chicago, offering them $2,000 per kilogram transported. The details of the three co-conspirators' stories were substantially consistent with each other and with the DEA account. In his brief, Mendiola inventories each inconsistency, and we acknowledge that the testimony of the co-conspirators, like that of many drug traffickers, was less than pristine.

Galindo testified the most extensively about Mendiola's active role in the conspiracy, explaining how Mendiola transported cocaine, collected money, arranged to send narcotics proceeds back to Mexico, picked up couriers who were transporting cocaine from Mexico, and packaged money to be transported back to Mexico. He also detailed Mendiola's part in the November 1 incident in which Mendiola and Galindo retrieved the couriers and drugs at the bus station. The agents involved in the initial seizure at the bus station and the eventual arrest corroborated the testimony of the cooperating defendants. The other evidence presented to the jury included multiple stipulations and physical evidence including the clothing with hidden pockets, drug evidence, surveillance photographs, materials used to package the drugs, a firearm, and the English transcripts of the intercepted Title III wire intercepts involving Mendiola and his co-conspirators.

Those intercepted calls played an important role in the prosecution because they attributed particular acts and responsibilities to Mendiola. Co-conspirator Galindo identified Mendiola's voice on several incriminating recorded calls describing multiple aspects of the conspiracy. Those recordings, with Galindo's identification of Mendiola's voice and nickname, provided evidence of Mendiola's participation in the conspiracy, including his role in packaging the cocaine and money, arranging cover loads to hide money sent back to Mexico, housing the drug couriers, obtaining false identification cards, and possessing firearms. At the end of the seven-day trial, the jury found Mendiola guilty of three counts of

narcotics trafficking for which the district court judge sentenced him to 151 months' incarceration.

Fortunately for the prosecution, Mendiola's trial did not rise or fall on Galindo's voice identification alone, for Galindo, like many drug dealers hoping to secure a better deal for themselves, was burdened by significant credibility issues. DEA linguist, Georgina Nido also identified Mendiola as the speaker on those intercepted conversations.[1] Prior to trial, Mendiola stipulated that a set of transcripts would be prepared for use at trial and that the English translations of the Spanish-language calls were authentic.[2] Two days after the trial began and the day before Galindo was due to testify, Mendiola's counsel informed the government that he would stipulate to the translations of the transcripts and the identities of the speakers for each transcript with the exception of the identity of Mendiola himself. The government then informed defense counsel that it intended to call a DEA linguist to compare a known voice exemplar of the defendant obtained from calls recorded at the Metropolitan Correctional Center in Chicago to the voices in selected calls offered into evi-

[1] Nido actually worked for a private company, MVM Inc., which performs contract work for the DEA.

[2] Common sense and our case law both dictate that juries need transcripts of recorded conversations when those conversations take place in a foreign language and are admitted into evidence before an English-speaking jury. *United States v. Cruz-Rea*, 626 F.3d 929, 936 (7th Cir. 2010).

dence. Over objection from Mendiola, Nido testified that the voice on four of the calls, "sounded very similar, if not identical" to that on the voice exemplar of Mendiola. App. R. 32-3, p. 699; D. Ct. R. 232, p. 151; Tr. 6/1/09, p. 509.

After the guilty verdict, Mendiola filed post-trial motions requesting acquittal, or in the alternative, a new trial, claiming, in part, that the district court erred in admitting the DEA linguist's voice authentication testimony under Federal Rules of Evidence 701, 702, and 1002. In rejecting the motion for acquittal or a new trial, the district court determined that Nido had sufficient familiarity with Mendiola's voice and that the prosecution did not tender Nido as an expert witness, nor did it need to. Mendiola appeals to this court and we affirm.

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Stadfeld*, 689 F.3d 705, 712 (7th Cir. 2012). Mendiola bandies about the *de novo* standard, but as our discussion will reveal, this was a simple evidentiary ruling about whether Nido met the requirements for identifying a voice or not. The district court did not have to interpret the Federal Rules of Evidence. This is just one of the ways in which Mendiola's 13,939-word, single-issue brief creates complexities where there are none.[3]

In fact, there is but a single issue presented on appeal: Whether the district court erred in admitting Nido's

---

[3] The limit for an appellate brief—even one in which the parties must address multiple complex issues is 14,000 words. Fed. R. App. p. 28.1(e)(2)(A)(1).

voice identification. According to Mendiola, the initial issue we need to address is what exactly Nido was doing when she identified Mendiola as the speaker on the recording. Mendiola argues that Nido was a wolf in sheep's clothing—or rather an expert in a lay witness's clothing—trying to squeak in evidence as a lay witness to avoid the more stringent qualification requirements for expert testimony. *See* Fed. R. Evid. 701, 702.

It is Federal Rule of Evidence 901 (b), however, which enunciates the amount and quality of evidence sufficient to satisfy the requirement of voice identification. It states that the following is sufficient evidence of voice identification: "an opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker." *Id.* The accompanying notes state that "aural voice identification is not a subject of expert testimony." Fed. R. Evid. 901 advisory committee's note to subdivision (b), example (5). This Circuit has long agreed. *United States v. Recendiz*, 557 F.3d 511, 527 (7th Cir. 2009) ("In light of Rule 901, [the] contention that the court erred in admitting [an agent's voice] identification because he was not qualified as an expert is wholly meritless."), *United States v. Magana*, 118 F.3d 1173, 1208 (7th Cir. 1997); *United States v. Degaglia*, 913 F.2d 372, 375-76 (7th Cir. 1990). In short, Mendiola did not need to be vetted as an expert prior to identifying Mendiola's voice.

Mendiola's point seems to be that using a person who is an "expert" in some tangential field (in this case, a

linguist who translates live wiretap conversations from Spanish to English) as a lay witness for voice identification can confuse the jury into thinking that the person is an expert in voice identification. Experts in other areas of law enforcement, however, are routinely used as lay voice identification witnesses, as they are the ones who have often heard the wiretap, or had an interview with a suspect. For example, in *Mansoori*, the FBI language specialist who prepared the English translations on the recorded conversations also identified the voices of the recordings as belonging to the defendant and his brother after hearing the brothers speak at a court proceeding. *United States v. Mansoori*, 304 F.3d 635, 665 (7th Cir. 2002). *See also United States v. Cruz-Rea*, 626 F.3d 929, 935 (7th Cir. 2010) (DEA agent who listened to voice exemplar 50-60 times was able to identify speaker in recorded conversations); *Recendiz*, 557 F.3d at 527 (special agent participating in arrest and interview identified voice as the same as one in wiretapped call); *United States v. Ceballos*, 385 F.3d 1120, 1124 (7th Cir. 2004) (Spanish language translator identified the voice); *Degaglia*, 913 F.2d at 376 (voice identification by DEA agent). Not surprisingly, prosecutors frequently enlist language interpreters and translators to identify voices in court as they are the ones who have listened intently to the recorded or overheard conversations. *See, e.g., Ceballos*, 385 F.3d at 1124 (Spanish interpreter identified voice); *United States v. Pulido*, 69 F.3d 192, 197 (7th Cir. 1995) (FBI translator identified voice); *United States v. Garcia*, 413 F.3d 201, 207 (2d Cir. 2005) (the prosecution did not present the interpreter as an expert in

voice identification, but as a lay witness who had acquired considerable familiarity with the intercepted voices from her work monitoring the wiretap); *United States. v. Rrapi*, 175 F.3d 742, 751 (9th Cir. 1999) (The FBI translator identified defendant's voice discussing the crime.).

Thus Nido's qualifications in another area do not disqualify her as a lay witness for voice identification purposes provided she otherwise met the qualifications for the latter role. Federal Rule of Evidence 901(b) permits a witness to identify a voice "based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." The bar for familiarity is not a high one. This court has held that hearing a defendant's voice once during a court proceeding satisfies the minimal familiarity requirement. *Mansoori*, 304 F.3d at 665; *see also Recendiz*, 557 F.3d at 527 (DEA agent who listened to a recorded phone conversation between defendant and another speaker and then spoke with him during his arrest and post-arrest interview was qualified to testify that defendant's voice at the hearing was the same one from recorded call); *United States v. Jones*, 600 F.3d 847, 857-58 (7th Cir. 2010) (voice identification legally sufficient where a detective never personally spoke with defendant, but on four or five occasions heard defendant speak in a courtroom uttering as little as two or three sentences each time); *United States v. Khorrami*, 895 F.2d 1186, 1194 (7th Cir. 1990) (recorded phone conversations properly admitted based in part on testimony of a lay witness who identified the defendant's voice after making one call to the

defendant's residence and comparing the voice of the person who answered to the voice on the recordings); *United States v. Saulter*, 60 F.3d 270, 276 (7th Cir. 1995) (two short conversations during a drug purchase satisfied the minimal familiarity requirement); *United States v. Grier*, 866 F.2d 908, 921 (7th Cir. 1989) (recordings properly admitted where FBI agent who had spoken once with the defendants identified their voices on the tapes). Questions concerning the accuracy of the identification in light of the amount of familiarity go to the weight the jury accords to the identification, not its admissibility. *Mansoori*, 304 F.3d at 665; *Jones*, 600 F.3d at 858.

Mendiola's argument that Nido's testimony was not based on personal knowledge is a red herring, first because Nido herself listened to both the recorded conversations and the exemplar recording, and second because Nido met the "minimal familiarity test" for voice identification under Federal Rule of Evidence 901(b)(5). Although the single issue presented in this case is whether the court erred by allowing Nido to identify Mendiola's voice on the recordings, and *the* federal rule of evidence that addresses the requirements for evidence identifying a person's voice is Rule 901(b)(5), the defendant fails to mention this rule even once in forty-four pages of his opening briefing. Instead, Mendiola spends the bulk of his brief discussing Federal Rules of Evidence 701 and 702, which discuss requirements for lay and expert witnesses respectively. This is akin to discussing only the qualifications for getting a driver's license rather than the rules for making a right turn on red, in a case where the sole

issue is whether the defendant was permitted to make a right turn on red.

To be certain, Nido's testimony must meet the requirements of both Rule 901 and Rule 701, but the 701 requirements are readily met in this case.[4] Pursuant to Rule 701, a witness who is not an expert may offer an opinion when it is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

Requirement (c) is easily met. Nido was not proffered as a witness nor did she need to be. Rule 901(b)(5) and its commentary make it clear that expert testimony on voice identification is not required.

Mendiola is simply incorrect that the requirement in subsection (a) that her opinion be rationally based on her own perception means that Nido must have had "personal interaction with the defendant." (Mendiola's opening brief at 16). Rule 701 does not require that the witness actually have participated in the recorded conversations. *Saulter*, 60 F.3d at 276. The requirement

---

[4] If for some reason there was some conflict between Rule 901 and Rule 701, the specific language of Rule 901 would control over the general language of Rule 701. *United States v. Kuecker*, 740 F.2d 496, 502 (7th Cir. 1984). In this case there is no conflict and the requirements of both rules have been satisfied.

that lay opinion be based on the perception of the witness imports into Rule 701 the personal knowledge standard of Rule 602. *United States v. Bush*, 405 F.3d 909, 916, n. 2 (10th Cir. 2005). And the knowledge required by Rule 602 is not absolute or unlimited knowledge but simply that awareness of objects or events that begins with sensory perception of them, a comprehension of them, and an ability to testify at trial about them. 29 Charles Wright & Victor Gold, *Federal Practice and Procedure* § 6254 (1st ed. 1997). *See also Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (personal knowledge may include reasonable inferences as long as those inferences are grounded in observation or other first-hand personal experience). Moreover, the specific rule governing voice identification—Rule 901(b)(5)—clearly contemplates that the interaction leading to identification might not be in person: "[i]dentification of a voice, *whether heard firsthand or through mechanical or electronic transmission or recording*—based on hearing the voice at any time under circumstances that connect it with the alleged speaker." Fed. R. Evid. 901(b)(5) (emphasis ours). Nido listened to the recordings, compared them to the exemplar, and was able to report her perceptions to the jury. To reiterate, if there was a question as to the quality of the perception, that went to the weight the jury attributed to her comparison.

Mendiola also argues that Nido's testimony fails part (b) of Rule 701's requirement that lay opinion testimony be "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Fed.

R. Evid. 701(b). Mendiola argues that Nido's testimony was not helpful because the jury could have listened to the recordings and made its own determination as to whether the voices matched. We have recently noted that although Rule 701 requires that evidence be helpful, the fact that a jury might have the same opinion as the testifying witness does not negate the helpfulness of the testimony. *Cruz-Rea*, 626 F.3d at 935; *see also United States v. Towns*, 913 F.2d 434, 445 (7th Cir. 1990). Moreover, the recordings were in Spanish whereas the jury members were not, we presume, fluent in Spanish (and even if one were, it would not be proper for that juror to act as translator for the group). One of the ways in which we identify a person's voice is through the idiosyncrasies of his or her speech. Often regional idioms or dialects give us away. Did the speaker say "soda" or "pop?" Is the second person plural uttered as "yous," "you guys," "y'all," or "yinz?" Hearing a distinctive New York accent in Chicago, or a Boston accent in Birmingham for example, would help a jury or lay witness identify a voice. It is highly unlikely that a non-native Spanish speaker would be able to hear or identify these regional idioms and dialectal differences. In fact, recorded conversations in foreign languages present unique issues for juries. To address these challenges, a district court judge has wide discretion in determining whether to allow juries to use written transcripts as aids in listening to audiotape recordings. *United States v. Breland*, 356 F.3d 787, 794 (7th Cir. 2004). We have emphasized, however, that in cases in which the recording is in a language foreign to the jury, transcripts (along with the proper admonishments about their use) are a

"virtual necessity." *Cruz-Rea*, 626 F.3d at 936. It is simply common sense that an English-speaking jury cannot adequately identify voices in languages in which they are not familiar or even fluent. This is why defendant Mendiola's myriad references to opinions in which courts held that juries could compare photographs or surveillance video themselves are inapt. (*See* Mendiola's brief at 17-22). In many instances, juries are indeed capable of making comparisons between pictures, videos, and human likenesses without any experience or particular knowledge, in a way that an English-speaking jury listening to a Spanish language conversation cannot. This is not to say that juries never need assistance from a lay witness for visual identification. "Generally, a lay witness may testify regarding the identity of a person depicted in a surveillance photograph 'if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury.' " *United States v. White*, 639 F.3d 331, 336 (7th Cir. 2011) (citing *Towns*, 913 F.2d at 445).

Mendiola argues that because Galindo had already authenticated the recording, Nido's identification was not helpful and thus not allowed. As we noted above, we have never held that testimony is unhelpful merely because a jury might have the same opinion as the testifying witness; *Cruz-Rea*, 626 F.3d at 935; nor would it be unhelpful merely because another witness has offered the same identification. It is true that either Galindo or Nido could have authenticated the recording—that is, made a prima facie showing that the evidence was what the government purported it to be—

a wiretap recording on which Mendiola was speaking. Authentication, however, does not require the proponent to prove beyond a reasonable doubt that the evidence is what it purports to be. "The task of deciding the evidence's true authenticity and probative value is left to the jury." *United States v. Fluker*, 698 F.3d 988, 999 (7th Cir. 2012); *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997). The government was entitled, therefore to put on as much evidence as the court would tolerate to prove the true authenticity and fortify the probative value.[5]

Galindo and Nido's testimony each contributed distinctly to the government's case. Although Galindo had severe credibility issues, the testimony of other coconspirator drug dealers can be quite helpful in identifying voices and describing conversations, as those coconspirators have knowledge of the group's nicknames and the terms being used in drug dealings in general, and in these drug dealings specifically, as well as having familiarity with the defendant's tone and method of speech. *See Saulter*, 60 F.3d at 276. Nido, on the other hand, had less familiarity with Mendiola's voice, but far greater credibility and more experience in listening to wiretap recordings.

As for Mendiola's argument that Nido's testimony violated the Best Evidence Rule, one need only read the

---

[5] The defendant never raised any issues about whether the *content* of that recording was admissible, i.e., whether it contained hearsay evidence, privileged communication, or the like.

twenty-three words of the Best Evidence Rule to see why it is inapplicable here:

> An original writing, recording, or photograph is required in order *to prove its content* unless these rules or a federal statute provide otherwise.

Fed. R. Evid. 1002 (emphasis added). Despite Mendiola's confusion as to what constitutes the content of a recording, Nido's voice identification had no role in proving the content of the recording. A person's voice is an identifying physical characteristic and does not constitute the content of a communication. *See Gilbert v. California*, 388 U.S. 263, 267 (1967), *United States v. Dionisio*, 410 U.S. 1, 7; *Hubanks v. Frank*, 392 F.3d 926, 932 (7th Cir. 2004) (voice exemplars are not testimonial, but merely demonstrate a physical property of a defendant). Nido's testimony was offered only to identify the speaker on the recordings, not to prove, for example, whether the quantity of drugs discussed was the actual quantity of drugs involved in the transaction, whether Valadez had flown directly from Mexico City or Laredo, Texas, or whether Galindo was borrowing the truck to transport cocaine or to move from one house to another (*see e.g.*, Mendiola's brief at 5, 7). More importantly, Mendiola never requested that the court submit this "best evidence"—the actual recording—to the jury. *See* App. R. 32-3, pp. 35-36; D. Ct. R. 226, pp. 7-8; Tr. 10/14/09 pp. 7-8. *See also* oral argument at 00:45-1:04.

We thus hold that the district court properly admitted Ms. Nido's voice identification testimony. As no error occurred, we need not delve into the arguments

on harmless error. The judgment of the district court is affirmed.