Affirmed by unpublished PER CURIAM opinion. Judge GREGORY wrote a dissenting opinion.
Unpublished opinions are not binding precedent in this circuit.
PER CURIAM:
Jared Baraloto was convicted by a jury in the District of Maryland on the .charges alleged in a superseding indictment stemming from his involvement in a widespread conspiracy to purchase and resell stolen goods. The indictment charged Baraloto with four offenses: (1) conspiring to transport stolen goods in interstate commerce, in violation of 18 U.S.C. § 371; (2) transporting stolen goods in interstate commerce, in contravention of 18 U.S.C. *264 § 2314; (3) conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h); and (4) conspiring to commit wire fraud, in contravention of 18 U.S.C. § 1349. Baraloto appeals his convictions, maintaining that the court erred in allowing prosecution witnesses to speculate on whether goods were stolen, and asserting that the trial evidence was otherwise insufficient to support the verdict. As explained below, we affirm.
I.
The charges against Baraloto and his co-conspirators arose from a lengthy investigation into a large-scale organized retail theft scheme, in which shoplifters sold brand-new stolen items — mainly over-the-counter medications (“OTCs”) and health- and-beauty aids (“HBAs”) — to so-called “buy/sell” shops, including one called Fast Money, owned and operated by brothers Jerald Bradford and Scott Bradford.[1] In the conspiracy and theft scheme, Baraloto was a stolen property wholesaler, commonly known as a “fence,” who purchased stolen goods primarily from the Bradfords and sold them to Jerome Stal. In turn, Stal resold the stolen goods at flea markets, pawn shops, and retail websites, as well as to other wholesalers.
On March 25, 2010, investigators executed search warrants and arrested nearly all of the seventeen alleged conspirators, including Baraloto. Agents recovered over $1,000,000 in stolen merchandise, approximately $1,000,000 from bank accounts, and more than $140,000 in cash from the targeted buy/sell shops and pawn shops.
A.
On November 21, 2011, Baraloto alone proceeded to trial, during which the government presented the testimony of law enforcement officers and cooperating witnesses.[2] The cooperating witnesses — most of them already convicted — confirmed the nature of the conspirators’ business model, which consisted of purchasing new items in cash at steep discounts from shoplifters. One witness, Amber Boothe, testified that she, along with other shoplifters, had serious drug problems and used cash from the sale of stolen items to service their addictions. Boothe identified Baraloto as someone she saw at Fast Money when she was selling stolen goods.
The trial evidence further revealed that, in the final weeks before agents executed search warrants and ended the theft scheme on March 25, 2010, Baraloto and Stal partnered in a venture to purchase and operate a pawn shop called Blue Diamond. The pair intended that a major part of Blue Diamond’s business would come from OTCs and HBAs, and they attempted to recruit shoplifters away from other buy/sell shops involved in the broader theft scheme. In early and mid-March 2010, investigators monitored Stal’s personal cell phone, pursuant to a court-authorized wiretap. Those recorded calls revealed the details of the retail theft scheme, capturing numerous incriminating conversations among the various co-conspirators, including between Stal and Bar-aloto.
1.
At trial, the defense insisted that Baral-oto was unaware that the trafficked goods *265 might have been stolen, such knowledge being an essential element of the charged offenses. Baraloto’s counsel explained during his opening statement that the “heavily regulated” buy/sell industry had various safeguards in place to ensure its legitimacy. These safeguards included the requirement that shop owners “sheet,” or document, each transaction and provide the record to the local police department’s pawn unit. Each shop was also constrained to honor a “holding period” for every item it received, designed to “protect the victim of a crime [by] giving that person about 10 days to report the theft.” J.A. 766-68.[3] According to his lawyer, Bar-aloto “believed that the pawn shops from which he purchased health and beauty aids were complying with the sheeting [requirements],” and, accordingly, he lacked the necessary knowledge to be convicted. Id. at 769-70. The defense emphasized that Baraloto operated transparently, was paid by check, and maintained detailed records of his transactions, all of which suggested he was a “legitimate businessman.” Id. at 777.
Baraloto’s lawyer explained that there was a thriving secondary market for damaged or expired OTCs and HBAs, comprised of “people who want to bargain or simply cannot afford to pay retail prices.” J.A. 778. He suggested that the items Baraloto purchased from Fast Money were provided not by shoplifters, but instead by “dumpster div[ers].” Id. at 780. Those enterprising opportunists would retrieve new, in-the-box items from the dumpsters behind retail outlets and then sell the nearly expired or expired items for a profit to buy/sell shops. The shops would then resell such items to liquidators, flea markets, and individual buyers.
2.
Jerald Bradford, having pleaded guilty to criminal tax offenses, agreed to cooperate with the government. Bradford testified that, as part of his plea deal, he admitted that the items he purchased at Fast Money were stolen. Baraloto objected to this evidence, asserting that it was irrelevant, speculative, and made without firsthand knowledge. The district court overruled Baraloto’s objection, however, reasoning that Bradford was merely offering his lay opinion based upon “common sense” and his “familiarity with the industry.” J.A. 878.
Jerald Bradford explained that Fast Money was located in a depressed area of south Baltimore known as Brooklyn, which he characterized as “[v]ery rough, a lot of drugs, homicides.” J.A. 878. Bradford testified that about 90% of his clientele was comprised of drug addicts, referring to the “IV, needle marks on their arms, skin pops, stuff like that, and from them telling me.” Id. at 879. Bradford described the body odor attendant to many of his customers, who told him that they “wouldn’t take a bath to keep their pores elose[d] so they would stay high.” Id. The customers “all talked about how to score heroin. This is not something they keep hushed.” Id. at 937. These were the people, Bradford said, who brought in “all new items, from health and beauty aid[s], you know, razors, Prilosec, general stuff, Tylenol, Advil, Aleve,” that accounted for roughly 60% of Fast Money’s $3.3 million in sales between 2005 and 2009. Id. at 879-80.
Jerald Bradford indicated that his “[c]ommon sense” told him the items were *266 stolen: “[I]f someone came in with 20 boxes of Tylenol a hundred counts, 10 boxes of Prilosec, 42 counts [of] Fusion razor blades, going [to] sell them to me for less than a third of what they actually cost in the store,” this was a clear indication the items were stolen. J.A. 885. Bradford stated that he only purchased items that Baraloto approved. Bradford explained that he met Baraloto in 2007, and the two began their business relationship after Baraloto offered to pay a higher percentage on Bradford’s HBAs than Fast Money’s existing wholesaler. Baraloto eventually visited Fast Money every day, where he witnessed customers walking in the door carrying bags of items, often interacting with them. According to Bradford, Baraloto would not purchase items that were damaged or expired. Bradford sold these items at flea markets.
Jerald Bradford’s brother, Scott, explained how a typical HBA transaction at Fast Money worked: “[The customer] would come in and place the items that they were going to sell on the counter.” J.A. 977. The customer typically sorted the items himself, while an employee filled out the transaction sheet, pursuant to the sheeting requirements. Scott Bradford testified that Fast Money paid their customers about one-third of the items’ retail value.
As it had his brother, the government also asked Scott Bradford whether the HBAs he purchased were stolen. Baraloto objected on the ground that Bradford lacked the personal knowledge necessary to answer. The district court overruled the objection, observing that the government bore the burden of proving that the relevant items were stolen, and that circumstantial evidence — including that “the individuals who were doing the selling ... [were] heroin addicts [and] that the products were in their original packaging”— was an appropriate means of meeting this burden. J.A. 991. The court added that the Bradford brothers could “testify as to their conclusion, their lay opinion that many of the goods were stolen” for a number of reasons, not least because “it explains the actions that they took.” Id. at 992.
Scott Bradford thus explained that he knew the items he purchased were stolen because he “heard customers talk about the stuff they brought in,” including asking one another where they “shop,” or whether particular individuals were “on vacation” (i.e., in jail). J.A. 993-94. Bradford noticed track marks and other indicia of drug addiction on Fast Money’s customers, and he confirmed that Baraloto often “hung out” at Fast Money, interacted with the customers, and would have overheard the same conversations. Id. at 996, 999.
Baraloto objected again during the testimony of his former stepdaughter, Ashley Williams, who for a time had worked at Fast Money. Williams identified Baraloto as Fast Money’s “wholesaler” who often “h[u]ng out” at the shop, and agreed that Fast Money’s customer base was comprised overwhelmingly of drug addicts who brought in stolen goods. J.A. 1065-66. The district court again overruled Baralo-to’s evidence objection, providing a careful summary of its reasoning:
My thinking on this subject is essentially this: Count 2 of the [Second Superseding] Indictment charges ... Mr. Baraloto ... with interstate transportation of stolen goods. In order to sustain this charge, the government must prove beyond a reasonable doubt four elements .... The two elements that are most pertinent to this line of inquiry are, A, that the goods were stolen, and, B, the defendant’s knowledge that the goods were stolen.
*267 The government is entitled to introduce evidence of any tendency to prove that the goods were stolen and this is so under Federal Rule[s] of Evidence 401 and 402, provided that the requirements of 601 and 602 are satisfied, and those are the personal knowledge requirements.
The Bradford brothers, Miss Boothe, and to a certain extent, Miss Williams testified as to circumstantial evidence that the goods were stolen. Goods brought in by addicts, original packaging, retail store stickers, the large quantity of health and beauty aids and merchandise brought in by addicts and the fact that the store Fast Money purchased these items at less than retail price, the circumstantial evidence is all perfectly appropriate under 404(2) and 602.
The sticky question is whether the Bradford brothers and Miss Williams can testify as to an opinion that the goods were stolen.... Rule 701 states that if the witness is [not] an expert, the witness’s testimony in the form of opinions or inferences is limited to those opinions or inferences which are, A, rationally based on the perception of the witness, and here the opinion of the witness is rationally based upon the circumstantial evidence.... It would be helpful ... to the determination of [a] fact in issue, two facts in issue, were the goods stolen and did Mr. Baraloto know about it?
And, C, not based on scientific, technical, or other specialized knowledge and the scope of the 702, seems to me that while working in that kind of establishment is sort of specialized employment, that neither the Bradfords nor [Miss Williams’ s] testimony would be expert testimony that falls within the scope of 702.
So my view is that the inferences of the Bradford brothers and Miss Williams is properly admitted under Rule 701, so that their testimony to that effect is proper.
Id. at 1056-58. Williams then testified that she believed the goods that Fast Money purchased were stolen, not only because “[realistically, nobody has a hundred bottles of 500-count Tylenol at their house,” but also because some of the items “came in with tags from certain retail stores on them, and we took the tags off.” Id. at 1060-61.
Michael Ender and Daniel Mimer, who had each worked with Baraloto, testified about the nature of Baraloto’s business transactions. Those witnesses related that the customers who sold OTCs and HBAs to the buy/sell shops typically were addicts who needed money for drugs, and who often came in with new, in-the-box items “three, four times a day to cash in.” J.A. 1088.
Warren Allen Culver, an associate of Stal, testified that Stal’s direct suppliers included Baraloto. Culver described his involvement with the Blue Diamond pawn shop, the venture between Jerome Stal and Baraloto. Culver worked at the shop, primarily because he “knew the medicine side of the business.” J.A. 1175. Upon Baraloto’s instructions, Culver “sheeted” every transaction that took place at Blue Diamond. Culver stated that, in his mind, he was sheeting the purchase of stolen property.
Finally, the prosecutors called Stal as a witness. Stal discussed his previous convictions for transporting stolen property and related offenses, acknowledging that he served twenty months at the federal prison in Otisville, New York. Stal then described the types of HBAs he was willing to purchase from the buy/sell shops, stating that if the items had reached their *268 sell-by date, he had trouble reselling them to his contacts. Stal confirmed that Baral-oto became one of his suppliers around 2007, and that, over time, Baraloto brought in HBAs from three buy/sell shops. Stal kept track of his business dealings, including those involving Baraloto, by entering them into his accounting system. His records from 2006 to 2010 revealed sales in excess of $28.7 million, and purchases (from fences like Baraloto) exceeding $24.4 million. Baraloto was Stal’s fifth-largest supplier during that period, responsible for $1.8 million in sales. Describing the buy/ sell business, Stal explained that, in his experience, resalable HBAs could be procured in several ways. For example, when new products were introduced, retailers might provide the unsold old products at a discount. Or, one could use coupons to purchase the items at below the retail price. Also, one could secure items from reclamation centers. Stal testified, however, that he had not trafficked in such items, because most of his contacts would not accept goods that were expired or damaged, had been discontinued, or had old UPC codes.
3.
The prosecution also presented evidence of a series of wiretapped conversations between Stal and Baraloto. Certain recorded calls confirmed Baraloto’s knowledge of Stabs extensive network of customers, and the pair also discussed the status of the HBA business at Blue Diamond, together with the volume of HBA business coming out of Fast Money. The prosecutors ended their direct examination of Stal by playing a wiretapped conversation between him and Baraloto on March 29, 2010, four days after the partners had been arrested:
STAL: Alright. So what are you going to do?
* * *
BARALOTO: ... I just can’t see my life ah any other way you know, and I, I can’t, I can’t go to prison and even if I could go to prison, I couldn’t live outside of prison with the restrictions of a felony conviction, you know I can’t do it.
STAL: Ah it ain’t that bad.
Oh, what Scott [Bradford] say, he knows nothing?
BARALOTO: Yeah, Scott ..., optimistic that ah, that he’ll get off it so I guess he didn’t do anything. I’m just not, not that optimistic I don’t, I don’t know if I said something to somebody somewhere you know off the cuff. I don’t remember every conversation I ever had with everybody.
STAL: Right.
BARALOTO: You know they twist my words to make it sound like I said any fucking thing.
STAL: I’ll fess that they’re good at that. Just wait and see man don’t ahh don’t get all excited yet.
BARALOTO: I know, you know I’m just, you know contemplating the possibilities you know what, the way you know I’ll, I’ll wait to see what the affidavit says and if it says something ridiculous then you know then I, I’ll feel like I can beat it or have a chance that’s one thing, you know but if it’s something I can’t beat....
STAL: I last spoke to my lawyer he said, he said we’re not going to see anything for at least two to three months.
BARALOTO: What about the right to a speedy trial? Jesus Christ, haha.
*269 STAL: You can’t go to trial man they’ll kill ya. They’ll kill ya man. I’m telling ya.
BARALOTO: Yeah.
Id. at 113-16.
4.
During the defense’s cross-examination of Stal, Baraloto presented the transcript of a telephone call that the government had not introduced into evidence. That March 27, 2010 conversation, which contained Baraloto’s statements to Stal and Stal’s responses, was proffered to show that Baraloto did not know that the goods he dealt in were stolen. The transcript of this call reflects that Baraloto told Stal,
they’re trying to say like ... we knew, any of this shit was stolen. Well that’s not true; I mean how could we be sure. You know people make, people that I bought stuff from told me that in fact it wasn’t — they’d show me their sheets or the stickers on the shit that corresponded with the police report.
* * *
Well, I never witnessed anybody ever steal anything. I never, nobody ever told me that anything was stolen how could I have ever know something was unless I saw it or someone told me? You know, it’s just bullshit.
J.A. 1495.
The district court allowed Baraloto to introduce this call, not as substantive evidence of his alleged absence of knowledge, but as “arguably a prior inconsistent statement [of Stal’s] under [Rule] 613.” J.A. 1500; see id. at 1517 (court’s instruction to jury). The relevant portion was played to the jury, and Stal acknowledged that he understood Baraloto to be asserting his alleged belief that the items they dealt in had not been stolen.
B.
At the close of the government’s case-in-chief, Baraloto moved for judgments of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, arguing that “the Government has relied on certain ‘suspicious’ circumstances to prove” that Baraloto knew that the merchandise he dealt with was stolen, and that such evidence was legally insufficient to show actual knowledge. J.A. 1579. The district court denied the motion, explaining that “[a] number of witnesses testified that the shops attracted addicts seeking immediate cash with which to purchase drugs. Mr. Baraloto, who spent considerable time in the shops, especially Fast Money, was in a position to observe this fact.” Id. at 1672.
During the charge conference, the district court reviewed and considered the government’s request for a willful blindness instruction, to which Baraloto objected. The court declined to give the instruction, expressing its view that the evidence tended to prove actual knowledge, rather than a deliberate closing of eyes. See J.A. 1685. The charge specified that the prosecution must prove each element of each offense beyond a reasonable doubt. In explaining the concepts of knowledge and intent, the court recited that Baraloto “may be found guilty only if he acted willfully, intentionally, and with knowledge.” Id. at 1730. The court also instructed that “[t]he defendant’s conduct is not willful if it was due to negligence, inadvertence, or mistake.” Id. at 1732.
On December 9, 2011, the jury convicted Baraloto on all four offenses. On March 29, 2012, Baraloto renewed his motion for judgments of acquittal, advancing essentially the same arguments he had raised pre-verdict. The court again denied the motion, and, on June 29, 2012, sentenced Baraloto to fifty-six months in prison. Baraloto timely noticed this appeal. We *270 possess jurisdiction pursuant to 28 U.S.C. § 1291.
II.
We review challenges to a district court’s evidentiary rulings only to ensure that the court did not abuse its discretion. See United States v. Perkins, 470 F.3d 150, 155 (4th Cir.2006). “A court has abused its discretion if its decision is guided by erroneous legal principles or rests upon a clearly erroneous factual finding.” Brown v. Nucor Corp., 576 F.3d 149, 161 (4th Cir.2009) (citation and internal quotation marks omitted). Evidentiary rulings are also subject to harmless error review, such that we will not reverse if we can say “with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.” United States v. Brooks, 111 F.3d 365, 371 (4th Cir.1997) (citation omitted).
A defendant challenging the sufficiency of the evidence used to convict him faces a heavy burden. See United States v. Beidler, 110 F.3d 1064, 1067 (4th Cir.1997). A jury’s verdict commands the respect of an appellate court, and must be sustained if there is substantial evidence to support it. See United States v. Wilson, 198 F.3d 467, 469 (4th Cir.1999). Substantial evidence has been defined, in the criminal context, as “evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant’s guilt beyond a reasonable doubt.” United States v. Smith, 451 F.3d 209, 216 (4th Cir.2006) (internal quotation marks omitted). Furthermore, “[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented.” Beidler, 110 F.3d at 1067 (internal quotation marks omitted). Finally, “[rjeversal for insufficient evidence is reserved for the rare case where the prosecution’s failure is clear.” Id. (internal quotation marks omitted).
III.
In this appeal, Baraloto contends that the district court committed prejudicial error by permitting several lay witnesses to express their opinions that the goods being trafficked by Baraloto and Fast Money had been stolen. Baraloto insists, moreover, that the evidence against him at trial was insufficient to establish an essential element of each offense, namely, that Bar-aloto knew he was dealing in, and conspiring to deal in, stolen goods.
A.
Baraloto maintains that the lay witnesses’ testimony that Fast Money dealt in stolen goods was not based on personal knowledge. He suggests that this evidence was improperly admitted because the witnesses — Jerald Bradford, Ashley Williams, Warren Culver, Daniel Mimer, Michael Ender, and Jerome Stal — were not offered as experts, yet were permitted to testify on the basis of assumptions predicated on appearance, quantity, and price of goods, and on the characteristics of the sellers.
As spelled out below, we reject the contention that the prosecution’s witnesses improperly gave their opinions about whether items eventually sold to Baraloto were stolen. Federal Rule of Evidence 701 provides for the admission of lay opinion testimony that is “(a) rationally based on the witness’s perception; (b) helpful to clearly understanding the witness’s testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge [for which an expert would be required].” As we have explained, the line between lay opinion testimony and expert testimony “is a fine *271 one,” because “Rule 701 does not distinguish between expert and lay witnesses, but rather between expert and lay testimony.” United States v. Perkins, 470 F.3d 150, 155 (4th Cir.2006) (internal quotation marks omitted). In Perkins, we recognized that
[a]s an example of the kinds of distinctions that Rule 701 makes, the [Advisory] Committee instructs that the rule would permit a lay witness with personal experience to testify that a substance appeared to be blood, but that it would not allow a lay witness to testify that bruising around the eyes is indicative of skull trauma.
Id. Unlike the prerequisites for an expert witness under Rule 702, a lay witness is not required to “ ‘possess some specialized knowledge or skill or education that is not in possession of the jurors.’ ” Id. (quoting Certain Underwriters at Lloyd's, London v. Sinkovich, 232 F.3d 200, 203 (4th Cir.2000)). Rather, “a 19 lay opinion must be the product of reasoning processes familiar to the average person in everyday life.” United States v. Yanez Sosa, 513 F.3d 194, 200 (5th Cir.2008) (internal quotation marks omitted).
Recently, in United States v. Mendiola, one of our sister circuits reiterated that the perceptions of a lay witness must be based on knowledge, and not on speculation. See 707 F.3d 735, 741 (7th Cir.2013). Such knowledge need not be “absolute or unlimitedf, however,] but simply that awareness of objects or events that begins with sensory perception of them, a comprehension of them, and an ability to testify at trial about them.” Id. In Baraloto’s case, the prosecution’s lay witnesses readily satisfied the applicable standard. They had witnessed numerous transactions pertaining to Baraloto’s buy/sell retail business, and through these encounters were amply aware of the nature and conventions of that stolen goods enterprise. When persons known to be drug addicts repeatedly entered Fast Money with thousands of dollars worth of OTCs and HBAs, and proceeded to sell such items for pennies on the dollar, any reasonable observer could conclude, as a matter of common sense, that the goods were stolen. Thus, the lay witnesses’ testimony concerning the stolen nature of the goods was properly admitted and the trial court did not abuse its discretion.[4]
B.
We also reject Baraloto’s challenge to the sufficiency of the evidence. The government presented abundant evidence, direct and circumstantial, upon which the convictions can be sustained. The witnesses explained the nature of Baraloto’s business — a multi-million dollar stolen goods enterprise that preyed upon drug addicts who were desperate for quick cash. The enterprise perpetuated the theft and disposition of stolen goods, and it interrupted commerce. The government also presented telephone conversations between Baraloto and his partner, Stal, where Baraloto was not surprised that he had been charged with the interstate transportation of stolen goods, telling Stal that he was “not optimistic” and that he would not make any decisions until he received discovery in his criminal case.
*272 The witnesses consistently confirmed that they knew, based primarily on common sense, that the goods Baraloto was purchasing and selling were stolen. There was ample evidence for the jury to find that Baraloto, who dealt regularly with the witnesses — and who perceived the same circumstances and conducted the same transactions as had each of them — must have come to the same conclusion. See United States v. Beidler, 110 F.3d 1064, 1068 (4th Cir.1997) (recognizing that “ ‘knowledge of illegality may be proven by circumstantial evidence’” and “‘by drawing reasonable inferences from the evidence of defendant’s conduct’” (quoting Ratzlaf v. United States, 510 U.S. 135, 149 n. 19, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994))).
Baraloto seeks support on his sufficiency contention from our decision in United States v. Ebert, which reversed the convictions of multiple defendants who were found guilty of money laundering and receiving stolen goods — namely OTCs and HBAs. See No. 96-4871, 1999 WL 261590 (4th Cir.1999) (unpublished). Ebert, however, is non-precedential and readily distinguishable. That prosecution was based on the theory of willful blindness, and we determined that the court had improperly instructed the jury in that regard. Instead of pointing to witnesses who knew the goods were stolen, the government presented “highly suspicious circumstances” to the jury, including “plain brown boxes” and low prices, to prove 22 that the defendants were deliberately ignorant of the stolen goods. See id. at *13, 22. Here, the district court properly recognized in its December 2, 2011 Memorandum to Counsel that, in Ebert, “[t]here was ... no evidence that the defendants had direct knowledge” of the stolen nature of the goods. J.A. 1670. The prosecution’s case against Baraloto on the stolen nature of the goods was much more substantial, and the trial court declined to instruct on willful blindness, correctly explaining that the evidence tended to prove actual knowledge, rather than willful blindness. See id. at 1685. Indeed, there was an abundance of direct and circumstantial proof that the goods Baraloto bought and resold had been stolen, and more than enough evidence for the jury to conclude that Bar-aloto knew that he was dealing in, and conspiring to deal in, stolen goods.
IV.
Pursuant to the foregoing, the judgment of the district court is affirmed.

AFFIRMED.

. As the government explains in its brief, a buy/sell shop allows customers to sell items outright, as opposed to a pawn shop, which permits its clientele to borrow money against items left with the shop as collateral.

. The trial lasted a total of nine days, ending on December 9, 2011. There were twelve prosecution witnesses. Baraloto did not testify-

. Citations herein to "J.A_” refer to the contents of the Joint Appendix filed by the parties in this appeal.

. Aside from the opinion testimony that the goods were stolen, Amber Boothe, a former drug addict and shoplifter, testified that she routinely stole HBAs from retail stores and sold them immediately to Fast Money. Boothe also confirmed that, from her time at Fast Money, she recognized Baraloto as a visitor to the store. Boothe's testimony alone created a triable question of fact concerning whether Baraloto knew the goods were stolen.